1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RICARDO BUSH,

11          Plaintiff,                    No. CIV S-08-1167 GGH

12      vs.

13   MICHAEL J. ASTRUE,                   ORDER
     Commissioner of
14   Social Security,

15          Defendant.

16   _____/

17          Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18   Security ("Commissioner") denying her application for Supplemental Security Income ("SSI")

19   under Title XVI of the Social Security Act ("Act").

20          For the reasons that follow, plaintiff's Motion for Summary Judgment is granted

21   in part, the Commissioner's Cross Motion for Summary Judgment is denied in part, this case is

22   remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for consideration

23   of "new" evidence, including its impact on the date of onset of plaintiff's disability; and pursuant

24   to sentence four of 42 U.S.C. § 405(g) for further development of the record regarding plaintiff's

25   kidney stones and migraine headaches beyond step two of the analysis.

26   /////

1

BACKGROUND

Plaintiff was born on February 24, 1965. (Tr. at 34). Plaintiff applied for disability benefits on December 10, 2003. (Tr. at 73). Plaintiff alleged that he was unable to work due to a head injury and neck, back and shoulder pain. (Tr. at 91. ) In a decision dated September 27, 2006, ALJ Thompson made the following findings:[1]

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2006.

2.   The claimant has not engaged in substantial gainful activity since December 20, 2001, the alleged onset date (20 CFR 404.1520(b), 404,1571 et seq., 416.920(b) and 416.971 et seq.).

3.   The claimant has the following severe impairment: degenerative discs of cervical spine and lumbar spine (20 CFR 404,1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:
Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

1    that meets or medically equals one of the listed impairments in 20 CFR
     Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
2    404.1526, 416.920(d), 416.925 and 416.926).

3    5.    After careful consideration of the entire record, the undersigned finds that
           the claimant has the residual functional capacity to lift up to 20 pounds
4          with repeated lifting up to 10 pounds; stand 6 hours/8 hour workday; sit 6
           hours/8 hour workday; must alternate sit/stand positions every 2 hours for
5          5 minutes each; occasionally climb ramp/stairs, stoop, kneel, crouch or
           crawl; never climb rope/scaffolds; and, occasionally reach overhead.

6

7    (Tr. at 26-27.)

8    ISSUE PRESENTED

9           Plaintiff has raised the following issues: A) whether the ALJ failed to properly

10   credit the opinions of plaintiff's treating physician without a legitimate basis for doing so; B)

11   whether the ALJ rejected plaintiff's testimony regarding his pain and functional limitations

12   without clear and convincing reasons for doing so; and C) whether the ALJ failed to properly

13   credit the testimony of the vocational expert in response to questions which accurately reflected

14   on plaintiff's functional limitation.

15   LEGAL STANDARDS

16          The court reviews the Commissioner's decision to determine whether (1) it is

17   based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

18   the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

19   Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

20   Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

21   as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

22   625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ

23   is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

24   ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

25   "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

26   rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

3

1   ANALYSIS

2           A.  Whether the ALJ Failed to Properly Credit the Treating Physician's Opinion

3           Plaintiff argues that the residual functional capacity (RFC) adopted by the ALJ

4   reflected the opinions of the non-examining State Agency Physician Dr. Nguyen rather than the

5   opinions of Social Security Consultative Examiner Dr. Ren, who performed a complete

6   orthopedic examination of plaintiff.  Plaintiff improperly characterizes Dr. Ren as a "treating"

7   physician.

8           Dr. Ren and Dr. Nguyen agreed regarding several issues.  Both Dr. Ren and Dr.

9   Nguyen found that plaintiff could lift and carry up to 20 pounds occasionally and 10 pounds

10  frequently.  (Tr. at 461, 465.)  Both Dr. Ren and Dr. Nguyen found that plaintiff could stand and

11  walk up to six hours of an eight-hour work day.  (Tr. at 461, 465.)  Both Dr. Ren and Dr. Nguyen

12  found that plaintiff could sit for six hours for an eight hour work day.  (Tr. at 461, 465.)

13          Plaintiff cites the following disagreements in the opinions of these doctors.  Dr.

14  Ren found that plaintiff should avoid above shoulder joint activities.  (Tr. at 461.)  Dr. Nguyen

15  found that plaintiff could occasionally reach overhead.  (Tr. at 467.)  Dr. Ren found that plaintiff

16  must alternate sitting and standing to relieve pain and discomfort.  (Tr. at 461.)  Dr. Nguyen

17  found that plaintiff must alternate sitting and standing to relieve pain and discomfort every two

18  hours for five minutes.  (Tr. at 465.)

19          In relevant part, the ALJ adopted the opinions that Dr. Ren and Dr. Nguyen agreed

20  on.  (Tr. at 29.)  The ALJ adopted Dr. Nguyen's assessment that plaintiff must alternate sitting

21  and standing to relieve pain and discomfort every two hours for five minutes.  (Tr. at 29.)  The

22  ALJ also adopted Dr. Nguyen's opinion that plaintiff could occasionally reach overhead.  (Tr. at

23  29.)

24          RFC is an administrative assessment of the extent to which a claimant's medically

25  determinable impairment(s), including any related symptoms, such as pain, may cause limitations

26  or restrictions that may affect his or her capacity to do work-related activities.  See Social

4

1  Security Ruling FN6 96-8p; see also 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  "Ordinarily,

2  RFC is the [claimant's] maximum remaining ability to do sustained work activities in an ordinary

3  work setting on a regular and continuing basis[.]" SSR 96-8 (emphasis in original).  RFC

4  represents the most that an individual can do in light of his or her limitations or restrictions.  Id.

5  The RFC assessment must be based on all of the relevant medical and other evidence in the case

6  record, such as medical history, medical signs and laboratory findings, the effects of treatment,

7  reports of daily activities, recorded observations, medical source statements, and effects of

8  symptoms.  See SSR 96-8p.  "The RFC assessment must always consider and address medical

9  source opinions." SSR 96-8p.  "Medical opinions are statements from physicians and

10  psychologists or other acceptable medical sources that reflect judgments about the nature and

11  severity of [claimant's] impairment(s) including [claimant's] symptoms, diagnosis and

12  prognosis." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  It is the ALJ's duty to evaluate the

13  medical opinions in the record and to explain the weight given to each medical opinion.  See 20

14  C.F.R. §§ 404.1527(d), 416.927(d).

15       The weight given to medical opinions depends in part on whether they are

16  proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

17  F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[2]  Ordinarily,

18  more weight is given to the opinion of a treating professional, who has a greater opportunity to

19  know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th

20  Cir. 1996).

21       To evaluate whether an ALJ properly rejected a medical opinion, in addition to

22

23  ────────────────

    [2]  The regulations differentiate between opinions from "acceptable medical sources" and
24  "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed
    psychologists are considered "acceptable medical sources," and social workers are considered
25  "other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status
    when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific
26  regulations exist  for weighing opinions from "other sources."  Opinions from "other sources"
    accordingly are given less weight than opinions from "acceptable medical sources."

considering its source, the court considers whether (1) contradictory opinions are in the record;

and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a

treating or examining medical professional only for *"clear and convincing"* reasons.  Lester , 81

F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be

rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

professional's opinion generally is accorded superior weight, if it is contradicted by a supported

examining professional's opinion (supported by different independent clinical findings), the ALJ

may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir.

2001),[3] except that the ALJ in any event need not give it any weight if it is conclusory and

supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999)

(treating physician's conclusory, minimally supported opinion rejected); see also Magallanes,

881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

The court agrees with defendant that there are no inconsistencies between the

opinions of Dr. Ren and Dr. Nguyen regarding plaintiff's need to alternate sitting and standing.

The only difference between the opinions is that Dr. Nguyen gave an estimate as to how often

plaintiff would have to switch positions.  This estimate is not inconsistent with Dr. Ren's

opinion.

The opinions regarding plaintiff's ability to reach overheard were conflicting.

"Occasionally" means occurring from very little to up to one-third of the time. SSR 83-10.  Dr.

Ren's opinion that plaintiff should avoid above shoulder activities is inconsistent with Dr.

---

[3]  The factors include: (1) length of the treatment relationship; (2) frequency of
examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
(5) consistency; (6) specialization. 20 C.F.R. § 404.1527

1    Nguyen's opinion that plaintiff could, in effect, reach overhead up to one third of the time.

2    However, in the pecking order of evidence priority, the examining physician should be believed

3    over that of the non-examining physician *especially* because the medical record as discussed,

4    *infra*, does show injuries to plaintiff's shoulder (impingement and rotator cuff problems) which

5    would make it difficult to reach overhead.

6            It is questionable whether the court need finally decide this conflict because the

7    jobs the vocational expert found plaintiff capable of performing probably did not involve

8    reaching overhead.  The Vocational Expert found that plaintiff could be a cashier, garage

9    attendant and courier.  (Tr. at 30.)  Assuming the ALJ improperly rejected Dr. Ren's opinion that

10   plaintiff should avoid above shoulder activities, any error was harmless because these jobs rarely,

11   if ever, would require plaintiff to reach overhead.  Curry v. Sullivan, 925 F.2d 1127, 1121 (9th

12   Cir. 1990) (an error which has no effect on the ultimate decision is harmless).  The court is

13   reluctant to finally decide this issue in that, although it has common sense, it does not have the

14   vocational expertise to decide that the jobs are nearly completely devoid of over the shoulder

15   reaching.   Because this case will be remanded on other grounds, no final determination will be

16   reached herein.  However, the ALJ is free to re-analyze this issue based on the DOT or vocational

17   expert.

18           B.   Whether the ALJ Failed to Credit Plaintiff's Testimony

19           The ALJ found that plaintiff's degenerative discs in his cervical and lumbar spine

20   constituted a severe impairment.  Plaintiff argues that the ALJ failed to credit his testimony

21   regarding the pain and limitations associated with his back problems.  Plaintiff further argues that

22   the ALJ failed to credit his testimony regarding shoulder pain, migraine headaches, pain caused

23   by kidney stones and diminished grip strength in his hands.

24           The court's review of the record indicates that the pain and limitations

25   experienced by plaintiff as a result of medical problems with his shoulders, kidney stones, hands

26   and wrists and migraine headaches was unrelated to the severe impairment found by the ALJ, i.e.

7

degenerative discs.  For that reason, the court only considers whether the ALJ failed to credit

plaintiff's testimony regarding the pain and limitations related to his back problems.  As will be

discussed below, plaintiff separately argues that the ALJ failed to find that his shoulder

problems, migraine headaches and kidney stones constituted severe impairments.

1.  Legal Standard

The ALJ determines whether a disability applicant is credible, and the court defers

to the ALJ who used the proper process and provided proper reasons.  See, e.g., Saelee v. Chater,

94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first

consider objective medical evidence and then consider other factors.  Vasquez v.  Astrue, 572

F.3d 586, 591 (9th Cir. July 8, 2009);  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en

banc).  The ALJ may not find subjective complaints incredible solely because objective medical

evidence does not quantify them.  Bunnell at 345-46.  If the record contains objective medical

evidence of an impairment reasonably expected to cause pain, the ALJ then considers the nature

of the alleged symptoms, including aggravating factors, medication, treatment, and functional

restrictions.  See Vasquez, 572 F.3d at 591.  The ALJ also may consider the applicant's: (1)

reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately

explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily

activities.[4]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61

---

[4]  Daily activities which consume a substantial part of an applicants day are relevant.
"This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
any way detract from her credibility as to her overall disability.  One does not need to be utterly
incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)

1  FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician and third party

2  testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony

3  and conduct, may also be relevant.  Light v. Social Security Administration, 119 F.3d 789, 792

4  (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations, see Quang Van Han

5  v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.

6  Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Plaintiff is required to show only that

7  her impairment "could reasonably have caused some degree of the symptom."  Vasquez, 572

8  F.3d at 591, quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007), Smolen, 80 F.3d

9  at 1282.  Absent affirmative evidence demonstrating malingering, the reasons for rejecting

10  applicant testimony must be specific, clear and convincing.  Vasquez, 572 F.3d at 591.

11         2.  Plaintiff's Testimony

12         At the hearing, plaintiff testified that he had pain in his neck and lower back.  (Tr.

13  at 604.)  The degree of pain varied.  (Tr. at 605.)  Plaintiff testified that on three occasions the

14  previous years he had leg pain.  (Tr. at 605.)  Plaintiff testified that standing and sitting caused

15  back pain.  (Tr. at 606.)  Plaintiff testified that the length of time he could stand varied.  (Tr. at

16  606.)  He could sit for half an hour or an hour.  (Tr. at 606.)  Plaintiff testified that he had not had

17  surgery on his neck or back.  (Tr. at 605.)

18         Plaintiff testified that his back was "killing" him at the hearing.  (Tr. at 615.)  He

19  testified that "[i]t's like a regular daily pain I've got to go through, my lower back."  (Tr. at 615.)

20  At its worst, his back pain could be a ten out of ten.  (Tr. at 615.)

21         3.  The ALJ's Decision

22         The ALJ went on to find that plaintiff's statements concerning the intensity,

23  persistence and limiting effects of his symptoms was not entirely credible:

24         After considering the evidence of record, the undersigned finds that the claimant's
       medically determinable impairment could reasonably be expected to produce the

26  (quotation and citation omitted).

alleged symptoms, but the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(Tr. at 27.)

The ALJ reasoned as follows:

The objective medical evidence fails to fully support the claimant. On January 28, 2001, the claimant struck his forehead on a beam at work. On September 10, 2001, he suffered another injury when he was driving a forklift and ran into a protective beam and was thrown into a cage and hit his face. (Exhibit 1F/4.) Cervical spine MRI , dated February 27, 2002, established mild degenerative narrowing and desiccation with spondylosis at the C5-6 and C6-7 levels. There was no evidence of spinal stenosis seen (Exhibit 1F/47). On August 23, 2002, lumbar spine MRI demonstrated disc and facet degeneration; mild and moderate bulges of the L4-5 and L5-6 discs respectively without significant central stenosis; and, mild lateral recess encroachment bilaterally at L4-5 (Exhibit 1F/46). In May 2003 Donald Ansel, M.D., reported that the claimant was precluded from very heavy lifting and working at unprotected heights. On examination, there was no evidence of wasting in the left upper arm or forearm. Back examination showed only slight limitation of neck motion. Low back examination also demonstrated good forward flexion but hyperextension was significantly limited with complaints of low back pain and lateral bending was about 50% of normal. Seated and supine straight leg raising were possible but on the supine leg raising the claimant claimed low back pain (Exhibit 1F/28-32).

Consultative orthpedic examination was performed on April 24, 2004, by Rajeswari Kumar, M.D. The claimant exhibited normal range of motion of the cervical spine. Lumbar spine range of motion was only slightly restricted. There was no clinical evidence of radiculopathy. Upper and lower extremity examination did not reveal any joint pathology. Examination of both shoulders showed full range of motion and there was no evidence of impingement syndrome. No muscle weakness was noted. Dr. Kumar concluded that the claimant had the ability to lift 50 pounds occasionally and 25 pounds frequently; frequently bend and stoop. He noted that the claimant had no limitations with sitting, standing, kneeling, climbing or upper extremity activities (Exhibit 2F).

In August 2003 the claimant exhibited full range of motion of the cervical spine and full range of motion on flexion, extension and lateral bending (Exhibit 4F.22). Chiropractor treating notes from 2002 revealed diagnoses including cervical sprain/strain; headache; and, thoracic sprain/strain (Exhibit 6F). By February 2003 the claimant was precluded from heavy lifting, repeated bending and stooping, and from work at or above left shoulder level. (Exhibit 6F/132).

In February 2004 John Branscum, M.D., reported that the claimant had a rather severe loss of grip on the left, but carpal tunnel examination was negative. Electrodiagstic studies suggested bilateral median nerve entrapment, worse on the right than the left, bilateral Guyon canal entrapment and bilateral C7 neuropathy. Dr. Branscum noted that the claimant had started vocational rehabilitation. He further stated that the claimant had been temporarily totally

10

disabled from September 11, 2001 until he started vocational rehabilitation (Exhibit 6F/57).

Consultative orthopedic evaluation was performed on July 9, 2005, by Junlong Ren, M.D.  The clinical impression included chronic neck pain, shoulder pain and back pain; impingement syndrome of the left shoulder; neck sprain; and, lumbar sprain superimposed upon degenerative disc disease.  The claimant exhibited decreased range of motion of the bilateral shoulder joints with positive impingement sign.  There was mild neurological deficit on the left upper extremity.  Dr. Ren opined that the claimant had the ability to life/carry [sic] 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours/8 hour workday; sit 6 hours/8 hour workday; should avoid above shoulder joint activities; and, must alternate sitting and standing (Exhibit 7F).

State agency reviewing physician reported on July 15, 2005, that the claimant had the ability to 20 pounds [sic] with repeated lifting up to 10 pounds; stand 6 hours/8 hour workday; sit 6 hours/9 hour workday; must alternate sit/stand positions every 2 hours for 5 minutes each; occasionally climb ramp/stairs; stoop, kneel, crouch or crawl; never climb rope/scaffolds; frequently balance; and, occasionally reach overhead (Exibit 8F).

Claimant's statements regarding symptoms and resulting limitations are generally credible, but not to the extent alleged that no work could be performed.  The claimant's medical records show that treating physician(s) responded with limited and conservative treatment.  Such treatment is inconsistent with the medical response that would be expected if the physician(s) found that symptoms and limitations to be as severe as reported by the claimant.

As for the opinion evidence, the undersigned grants appropriate weight to the State agency assessment (Exhibit 8F) and substantial weight to the consultative examiner (Exhibit 7F) based on supportability with medical signs and laboratory findings; and, consistency with the record. Dr. Branscum's assessment (Exhibit 6F/67) is generally credible, but not the extent alleged because the claimant's relevant medical records show that the treating physician(s) responded with limited and conservative treatment.  Such treatment is inconsistent with the medical response that would be expected if the symptoms and limitations were as severe as described by the physician.  It is noted that in April 2004 the claimant was reportedly capable of performing medium exertional work activities (Exhibit 2F).

(Tr. at 27-29).

4.   Treating Physician Records and Other Records

In addition to the reports of the consultative physicians discussed in the ALJ's

decision, the record contains some reports from MRIs taken of plaintiff's spine finding

significant injuries, and some not.  On February 27, 2002, an MRI was taken of plaintiff's

cervical spine.  (Tr. at 203.)  The diagnostic impression was:

1        Mild degenerative narrowing and desiccation with spondylosis at the C5-6 and
      C6-7 levels.

2        No evidence of clinically significant associated acquired spinal stenosis seen.
      When comparing both sagittal and axial views, all foramina appear adequately

3        patent as well.  Specifically, I see no evidence of likely significant exiting nerve
      root impingement.

4

5  (Tr. at 203.)

6        On August 23, 2002, plaintiff had an MRI of his lumbar spine.  (Tr. at 202.)  The

7  diagnostic impression was:

8        Disc and facet degeneration in the lower lumbar spine.  Mild and moderate bulges
      of the L4-5 and L5-S1 discs respectively without significant central stenosis.

9        Mild lateral recess encroachment bilaterally at L4-5.

10

11  (Tr. at 202.)

12        The physician's records demonstrate that plaintiff received regular chiropractor

13  treatment for his back beginning in July 2001 (Tr. at 454-455) until February 2005 (Tr. at 256).

14        In addition, plaintiff regularly received pain medication for complaints of serious

15  back pain.  The record indicates that plaintiff was prescribed different pain medications in

16  various combinations.  The court will set forth some of the entries from plaintiff's medical

17  records to support this finding.

18        Beginning in February 2002 (Tr. at 451-452) through some time in 2005, plaintiff

19  was regularly prescribed Valium (10 mg).  On March 25, 2002, plaintiff was prescribed

20  Naproxen in addition to Valium.  (Tr. at 438-439.)   On May 28, 2002, plaintiff was prescribed

21  Valium, Naproxen and Soma.  (Tr. at 422.)

22        On February 11, 2003, plaintiff was prescribed Valium, Tylenol # 4 and Soma.

23  (Tr. at 370).  On May 1, 2003, plaintiff was prescribed Valium, Tylenol # 4 and Soma.  (Tr. at

24  363.)

25        On August 14, 2004, plaintiff was prescribed Lortab in addition to Valium and

26  Soma. (Tr. at 342.)  In December 2003, plaintiff reported that his back pain was a six or seven

out of ten.  (Tr. at 325.)  The doctor prescribed Soma, Valium and Norco.  (Tr. at 326.)  On August 19, 2004 plaintiff reported the pain was no better and that the medication was less effective.  (Tr. at 277).  The doctor prescribed Methadone in addition to Valium.  (Tr. at 278.)  On September 14, 2004, plaintiff reported that the Methadone was ineffective.  (Tr. at 270.)  The doctor prescribed Valium and Norco.  (Tr. at 271.)

Beginning in 2005, it appears that plaintiff began seeing a new doctor who prescribed Naprosyn for pain.  On October 15, 2005, plaintiff was prescribed Naprosyn and Tylenol with Codeine for back pain.  (Tr. at 561.)  At that time he told the doctor that his pain was "ten out of ten."  (Tr. at 561.)  In February 2006, plaintiff's medication list included Naprosyn.  (Tr. at 556.)

The record indicates that plaintiff also went to the emergency room on several occasions complaining of back pain.  On March 7, 2004, plaintiff went to the emergency room where he was prescribed Vicodin and Soma.  (Tr. at 228.)  On March 10, 2005, plaintiff went to the emergency room where he complained that his back pain was a "ten out of ten."  (Tr. at 483.)  Plaintiff was prescribed Motrin and Vicodin.  (Tr. at 485.)

Finally, the record also indicates that plaintiff received trigger point injections on February 4, 2002 (Tr. at 453), March 25, 2002 (Tr. at 438-439), and November 26, 2002 (Tr. at 395-396).

5.  "New" Evidence

Were the court compelled to issue a decision on the record up to this point, the decision would be difficult.  There is substantial evidence in the record demonstrating credible pain.  The ALJ did not disagree.  The point, and it is a difficult one, is whether the pain precluded any work even more diminished in physical capabilities than the already much lessened physical work capacity found by the ALJ.  In light of medical evidence submitted before the Appeals Council (but not the ALJ) demonstrating more significant medical injuries, the issue of plaintiff's credibility should be determined again.

13

1       Following the ALJ's decision, plaintiff appealed to the Appeals Council. (Tr. at

2   9.) Two new exhibits were submitted in support of the appeal. (Tr. at 12.) The new exhibits

3   included records dated 9/13/06 to 11/1/06 from San Joaquin County Hospital and a letter dated

4   11/27/06 from the representative. (Tr. at 12.)

5       The records from the San Joaquin County Hospital include a report of an MRI of

6   plaintiff's cervical spine taken on August 31, 2006. (Tr. at 574.) The results of the MRI state,

7           Left C6-C7 epidural defect seen POST lateral extending foramen consistent with a
            disk herniation. Correlate clinically for radiculopathy.
8

9   (Tr. at 574.)

10      The Appeals Council denied plaintiff's request for review. (Tr. at 9.) In denying

11  the request for review, the Appeals Council considered the new evidence described above but

12  found that it did not provide a basis for changing the ALJ's decision. (Tr. at 9-10.)

13      Federal courts may undertake review of administrative adjudicatory decisions

14  made by the Department of Health and Human Services, but only if the decision is considered the

15  final decision of the Commissioner. 42 U.S.C. § 405(g). The Commissioner has issued

16  regulations which define when final decisions have been made. See, 20 C.F.R. § 416.1455

17  (defining when the decision of the ALJ is the final decision of the Commissioner, as well as the

18  function of the Appeals Council. 20 C.F.R. § 416.1467 et. seq.) Decisions of the Appeals

19  Council refusing to review an ALJ's decision on the merits because the issues raised do not meet

20  the requirement for review on the merits are not final decisions; in such cases the ALJ's decision

21  is the final decision of the Secretary. O'Dell v. Shalala, 44 F.3d 855, 858 (10th Cir. 1994);

22  Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); Russell v. Brown, 856 F.2d 81, 83-84

23  (9th Cir. 1988). Only if the Appeals Council grants review, and then issues a decision on the

24  merits does the Appeals Council's decision become the final decision of the Commissioner.

25  Russell v. Bowen, 856 F.2d at 83-84; Browning, 958 F.2d at 822. Thus, this court has no

26  jurisdiction to adjudicate the propriety of the manner in which the Appeals Council decided to

14

1   deny review in this case – be that review complete or incomplete, thoughtful or inconsiderate,

2   correct or incorrect.

3           However, somewhat paradoxically, the courts have held that evidence presented

4   to the Appeals Council is part of the record for district court review.  Ramirez v. Shalala, 8 F.3d

5   1449, 1452 (9th Cir.1993); accord, O'Dell v. Shalala, 44 F.3d at 859 (10th Cir.1994), Keeton v.

6   Dept. of Health & Human Services, 21 F.3d 1064, 1067 (11th Cir.1994), Riley v. Shalala, 18

7   F.3d 619, 622 (8th Cir.1994), Wilkins v. Dept. of Health and Human Services, 953 F.2d 93, 96

8   (4th Cir.1991).

9           Although the ALJ's decision is the final decision because the Appeals Council

10  denied the request for review, the Appeals Council stated that it considered the new evidence.

11  However, because it is clear that the ALJ did not review the August 31, 2006, MRI results, the

12  court construes the evidence submitted to the Appeals Council as new evidence of a sort.

13          Here, the MRI was conducted after the August 9, 2006, hearing.  Accordingly, the

14  court finds that plaintiff has shown good cause for not including it in the record before the ALJ.

15  Regarding materiality, it is clear that the MRI report showing the herniated disk is material to

16  plaintiff's credibility regarding back pain, and it may well relate to the disability period at issue.

17  Accordingly, this action is remanded to the ALJ for consideration of the MRI's of plaintiff's back

18  showing that he had a herniated disc as to the issues of his credibility and the date of onset of his

19  back-related disability.

20          C.  Whether the ALJ Properly Credited the Testimony of the Vocational Expert

21          Plaintiff argues that in posing hypothetical questions to the vocational expert, the

22  ALJ improperly rejected the limitations assessed by Dr. Ren.  In particular, plaintiff argues that

23  the ALJ should have asked the expert a hypothetical question based on Dr. Ren's assessed

24  limitation of no overhead activity and the need to alternate sitting and standing.  Plaintiff also

25  argues that the hypothetical questions failed to include the limitations to which plaintiff credibly

26  testified.

1        Hypothetical questions posed to a vocational expert must include all the

2   substantial, supported physical and mental functional limitations of the particular claimant.

3   Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995); see Light v. Social Sec. Admin., 119 F.3d

4   789, 793 (9th Cir.1997).  If a hypothetical does not reflect all the functional limitations, the

5   expert's testimony as to available jobs in the national economy has no evidentiary value.

6   DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d

7   947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE

8   had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all

9   limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by

10   other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions,

11   based on alternate interpretations of the evidence, substantial evidence must support the

12   hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen,

13   849 F.2d 418, 422 (9th Cir. 1988).[5]

14        Because the court finds that the ALJ must re-assess plaintiff's credibility

15   regarding his back pain based upon the new evidence, it need not address the argument that the

16   ALJ failed to ask hypothetical questions based on plaintiff's self-described limitations based on

17   back pain.  Plaintiff also argues that the ALJ failed to include hypothetical questions based on

18   limitations plaintiff testified to regarding his hands, wrists and migraine headaches.  Because

19   these limitations were unrelated to the severe impairment found by the ALJ, the ALJ did not err

20   in failing to ask hypothetical questions regarding these matters.

21        The ALJ included in his hypothetical questions to the expert the limitation of

22   having to change positions from sitting to standing in intervals of about 45 to 60 minutes.  (Tr.at

23   621.)  This question adequately represented Dr. Ren's views regarding plaintiff's need to change

24

25      [5]  Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a
hypothetical question propounded by a claimant's counsel."  Magallanes v. Bowen, 881 F.2d

26   747, 756 (9th Cir. 1989).  The ALJ is free to accept them if they are supported by substantial
evidence or reject them if they are not.  Id. at 756-757.

1   positions.  Assuming the ALJ should have included Dr. Ren's assessed limitation of no overhead

2   activity, any error was harmless because the jobs the expert recommended did not involve

3   overhead activity.  For these reasons, the court finds that plaintiff is not entitled to summary

4   judgment regarding the hypothetical questions to the expert based on Dr. Ren's report.

5           Buried in plaintiff's argument regarding the ALJ's failure to ask adequate

6   hypothetical questions is the claim that the ALJ failed to include plaintiff's right shoulder rotator

7   cuff tear, impingement syndrome in his left shoulder, migraine headaches and kidney stones as

8   severe impairments at step two.  Plaintiff's Summary Judgment Motion, p. 34: 10-14.  Defendant

9   did not address this argument in his cross-motion for summary judgment most likely because it

10  was not raised by plaintiff as a separate claim.  Nevertheless, the court will address this claim

11  below.

12          At the second step of the disability analysis, an impairment is not severe only if it

13  "would have no more than a minimal effect on an individual's ability to work, even if the

14  individual's age, education, or work experience were specifically considered."  SSR 85-28.  The

15  purpose of step two is to identify claimants whose medical impairment is so slight that it is

16  unlikely they would be disabled even if age, education, and experience were taken into account.

17  Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987).  "The step-two inquiry is a de minimis

18  screening device to dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th

19  Cir. 1996).  At this step, the ALJ may decline to find a severe impairment *only if the evidence

20  establishes a slight abnormality that has no more than a minimal effect on an individual's ability

21  to work."  Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005) (emphasis in original).

22          As far as this court is aware, plaintiff was not diagnosed with a rotator cuff tear in

23  his right shoulder.  Rather, as will be discussed below, he was diagnosed with a rotator cuff tear

24  in his left shoulder after an August 31, 2006, MRI.  However, this discrepancy will not deter a

25  finding of severe impairment in the left shoulder on the "new" record evidence.

26          Also included in the new records submitted to the Appeals Council are the results

17

1   of an MRI of plaintiff's left shoulder on August 31, 2006.  (Tr. at 575.)  The results of this MRI

2   state,

3       1.  Suspicion of the of [sic] full-thickness several mm to air in the anterior rotator
        cuff.
4       2.  There is degenerative spurring of the acromioclavicular joint and sus of a distal
        acromion spur as described above.
5

6   (Tr. at 575.)

7       Additional records from the San Joaquin County Hospital describe plaintiff's

8   shoulder injuries as a rotator cuff tear.  (Tr. at 579.)

9       As for plaintiff's argument that his left shoulder impingement was a severe

10  impairment, the August 31, 2006, MRI is new evidence in support of this claim.  Because this

11  MRI was not available at the time of the hearing before the ALJ and because it is material to the

12  issue of whether plaintiff's left shoulder impingement is a severe impairment, this issue is

13  remanded to the ALJ under section four of 42 U.S.C. § 405(g), as it was "record" evidence.  The

14  ALJ shall also consider the date of onset on any shoulder related disability in considering this

15  new evidence.

16      At the hearing plaintiff testified that he had migraine headaches two to three times

17  per week.  (Tr. at 612.)  Plaintiff testified that they lasted from fifteen minutes to six to eight

18  hours.  (Tr. at 612.)  Plaintiff testified that the medication he took, Imitrex, numbed the pain but

19  did not make the migraine go away.  (Tr. at 612-613.)

20      Plaintiff's medical records indicate that he had complained of headaches and

21  migraines for some time.  For example, in his February 18, 2004, report, Dr. Branscum wrote that

22  plaintiff complained of constant headaches.  (Tr. at 309.)  In his report, Dr. Ansel wrote that

23  plaintiff told him that his neck pain gave rise to headaches on an almost daily basis.  (Tr. at 162.)

24  In his report, Dr. Ansel referenced a January 29, 2001, Doctor's Report stating that plaintiff

25  reported a history of migraine headaches but no headaches had been recently reported.  (Tr. at

26  167.)  Plaintiff's records from his treating physicians also contained references to his complaints

1   of headaches.  For example, records from the San Joaquin General Hospital on October 19, 2005,

2   state that plaintiff complained of headaches.  (Tr. at 561.)  On November 17, 2005, he was given

3   a trial of Imitrex.  (Tr. at 560).

4          It is not clear whether plaintiff had migraine headaches during the time he was

5   working.  However, the evidence supporting plaintiff's claim that his migraine headaches were a

6   severe impairment is significantly probative.  In other words, the record suggests that plaintiff's

7   migraine headaches had more than a minimal effect on plaintiff's ability to work.  For that

8   reason, the court finds that the ALJ erred in not finding his migraine headaches to be a severe

9   impairment.

10         Regarding his kidneys, plaintiff testified that he had had problems with his

11  kidneys since childhood. (Tr. at 616.)  Plaintiff testified that he regularly passed kidney stones.

12  Plaintiff testified that he felt bad kidney pain four or five times a week.  (Tr. at 617.)  Plaintiff

13  testified that on a scale of one to ten, at worst his kidney pain was a ten.  (Tr. at 616.)

14         Medical records from plaintiff's treatment records demonstrated that plaintiff had

15  ongoing problems with his kidneys.  For example, on May 16, 2004, plaintiff went to the San

16  Joaquin General Hospital complaining about abdominal pain and vomiting.  (Tr. at 518.)

17  Plaintiff was admitted to the hospital for pain and diagnosed with a left kidney stone.  (Tr. at

18  516.)  Plaintiff had surgery to remove the kidney stone and a stent was placed in his left ureter.

19  (Tr. at 516.)  On June 3, 2004, plaintiff had an x-ray of his abdomen which revealed several large

20  stones in the lower pole of the left kidney and a tiny stone in the upper pole.  (Tr. at 500.)

21         On November 22, 2004, plaintiff had another x-ray of his abdomen which

22  revealed:

23         1.  Removal of double J stent.
           2.  Multiple staghorn-type calculi in the lower pole of the left kidney have
24         resolved.
           3.  Small right upper pole renal calculus and a small lower pole renal calculus.
25

26  (Tr. at 495.)

                                                   19

1        On July 5, 2005, plaintiff had another x-ray of his abdomen.  (Tr. at 490.)  This x-

2  ray revealed resolution of the previous left renal calculi and no acute findings.  (Tr. at 490.)  On

3  September 14, 2005, plaintiff was seen at the Urology Clinic for follow-up with kidney stones.

4  (Tr. at 564.)  The impression was nephrolithiasis (kidney stones) and hematuria (blood in urine).

5  (Tr. at 564.)

6        The evidence supporting plaintiff's claim of limitations caused by kidney stones is

7  significantly probative.  The record suggests that plaintiff's kidney stones had more than a

8  minimal effect on plaintiff's ability to work.  For that reason, the court finds that the ALJ erred in

9  not finding that his kidney stones were a severe impairment.

10        In sum, the court finds the ALJ's assessment is not fully supported by substantial

11  evidence in the record and based on the proper legal standards.  Accordingly, for the reasons that

12  follow, plaintiff's Motion for Summary Judgment is granted in part, the Commissioner's Cross

13  Motion for Summary Judgment is denied in part; this case is remanded to the Commissioner

14  pursuant to sentence four of 42 U.S.C. § 405(g) for consideration of new evidence, including its

15  impact on the date of onset of plaintiff's disability, and pursuant to sentence four of 42 U.S.C. §

16  405(g) for further development of the record regarding plaintiff's kidney stones and migraine

17  headaches beyond step two of the analysis.

18  DATED: 11/12/09

19                                              /s/ Gregory G. Hollows

20                                              _____
                                                GREGORY G. HOLLOWS
21                                              U.S. MAGISTRATE JUDGE

22

23  bush.ss3

24

25

26